Case number 24-5262. Jeff Pharmaceuticals, Inc. Appellant v. Robert F. Kennedy Jr., Secretary of the Department of Health and Human Services, et al. Mr. Agrawal for the Appellant. Mr. Springer for the Defensive Appellee. Mr. Jerry for the Intervenor Appellee. Thank you. Thank you, Judge Henderson. May it please the Court. Kwaku Akola for Jazz Pharmaceuticals. The Orphan Drug Act seeks to encourage businesses to invest in developing treatments for some 7,000 rare diseases, many very serious, that collectively afflict about 30 million Americans. FDA's rare disease website states that there are no drug treatments for most of those rare diseases, and one prominent advocacy group pegs the share at 90%. Now, the Act chiefly takes aim at that problem by creating a period of marketing exclusivity for companies that win approval for an innovative rare disease treatment, a seven-year period during which FDA, quote, may not approve certain other new drug applications. And, of course, the party's dispute is over which of those new drug applications is barred. Now, we think it's not just the scope of the prohibition, but really the nature of it that's at issue here. We say that the ordinary meaning of the statute's text and grammar resolve that question, and they do so in a way that makes the prohibition fixed and predictable and thus well-suited to spur business investment because it's pegged to the designation decision that FDA makes before the even submit the application for approval. It so ties the agency's hands by temporarily barring it from approving another application that would use the same designated drug to treat the same rare disease, and that comes straight from subsection A of the statute, which provides that if FDA approves an application, quote, for a drug designated under section 360 BB of the title for a rare disease or condition, unquote, then for a period of seven years, FDA may not approve another application. Here's a second quoted phrase, for the same drug, for the same disease or condition. And in those parallel phrases, for the same drug refers back to the antecedent for a drug designated under section 360 BB. And so the same drug, the same agency is temporarily barred from approving, is the drug previously designated for the approved application. And my friends on the other side offer, Judge Wilkins. Yeah, I'd like to interrupt. I want to kind of get down to grass taxing. Sure. What do you think the impact of the 2017 amendment is? What do you think it does? It has to do something, but what do you think it does? So the 2017 amendments, we think, and the text reflects this, are focused on the de-permit issue. So when there's already been, when there's already been one approval for a drug, for a designated drug to treat a particular disease or condition, can there be, in what circumstances can there be a second or successive seven-year period of marketing exclusivity? That's what the seven-year, that's what the 2017 amendments are all about. So if that's the case, I want you to tell me where in the designation section, that's 21 USC section 316 CD, there is anything in that statute that says that in order for a drug to be designated, not approved, but designated, that it has to have some sort of clinical superiority. Where does that appear in the statute in 3360 BB for designation? Sorry, is that there must, for designation purposes, where in the statute does it say there must be a demonstration of clinical? Yeah, let me ask it this way. The statute for designation of drugs for rare diseases or conditions basically says that if the FDA finds that this is a rare disease or condition that is to be treated by this drug that the sponsor is seeking to have designated, if they find that it is indeed a rare disease or condition, and that if approved, this will treat that rare disease or condition, they shall approve the designation. That's right. There's nothing in there that says that it also has to be clinically superior if it's the same drug. None of that language is in the designation provision, right? So the designation provision does include a requirement that the follow-on drug demonstrate a possible hypothesis of clinical. That's in the 2017 amendment, right? Yes. In the 2017 amendment amends 360 CC. The approval, it doesn't amend 360 BB designation. I think I'm losing my thrust of your honors question. Let me just make it plain to you.  I'm not playing poker here. I want you to understand what my concern is. Sure. It's why right now I'm inclined to say that I think that we lose. So let me lay it out. And then you can respond. Sure. So the FDA prior to 2017 had a regulation, which is at 21 CFR 316.25. It says that you can't get designation for the same drug as one that's been previously designated and approved for treatment of a rare disease or condition unless it's clinically superior. As best as I can tell, prior to 2017, there was nothing in the statute that allowed the FDA to place that limitation on designation. I understand. So if we follow the logic of DepoMed in legal pharmaceuticals, that regulation would be ultravehicular. I think I am. But it appears that with the 2017 amendment, by what you say the work that it does, the FDA has appeared to have blessed this way that designation works under the prior regulatory scheme by saying that, well, you can have an additional condition on whether something can be designated if in restriction, let's say, on whether something can be designated if a prior drug had been designated and approved, which is otherwise the same drug. So if Congress was approving or sanctioning or incorporating or outratifying, whatever word we want to use, that aspect of the pre-2017 regulatory scheme, then why did we conclude that they weren't also approving or ratifying the other aspect at the approval stage of what the FDA was doing prior to 2017 with respect to exclusivity? Did I make myself clear? You did, Your Honor. And let me see if I can answer. I think that the text helps us tremendously and that also the statutory history helps us  so tremendously. In the text, what you have is Congress picking up this idea that FDA had, that there ought to be limits on what they called serial exclusivity. So there's already been a drug for the same disease or condition that's been approved. In what circumstances does it make sense to give the next drug also a period of exclusivity and essentially what subsection C, D, and E reflect? Are Congress grappling with that question and saying it's got to be new innovation, so a clinically superior drug? Now, Your Honor's question is, well, why wouldn't they have also done that in subsection A? One answer is you don't see in subsection A anything like the reticulated description of how clinical superiority should operate at the approval stage, the marketing exclusivity stage, to allow FDA to say, well, actually, in seven years, we're going to break into it. You don't see the words clinical superiority there. You don't see them say, we have two exceptions in B. We'll have to add a third exception. And so you just don't have a mirror image of the careful attention they paid to clinical exclusivity, paid to the other question. And everyone agrees that FDA had this idea as well that they could break through existing unexpired periods of exclusivity. But you don't see that reflected in the 2017 amendment at all. You also don't see that coming to statutory history in the discussion of what Congress was doing. And I want to grant that that was what we have is very limited. But let me take you through what I think is telling. I read DeepMed to announce three criticisms of FDA's approach. One, that they issued regulations for 360CC without statutory authority. That was subsections A and B that existed at the time. And one distinction, Judge Wilkins, to 360BP, the prior statute, is that statute has and has long had express authority for FDA to promulgate regulations. And so it's indicative of policymaking in that part of the statute. So I guess the bottom line, though, is Congress chose to use the term same drug, which has a definition in the regulations. And also, it seems that that's a longstanding policy to treat such drug as same drug. And it also seems that Congress must have been aware of the same drug definition. But you're trying to tell us that Congress didn't mean to incorporate the same meaning of same drug that's defined by the regulation. That's right, because I don't think the text takes you there at all. Because, I mean, the Supreme Court has said in Yellen versus Confederated Tribes, linguistic similarity is not enough. When this court has looked at ratification, take Judge Henderson's decision in Genis, it said express approval is what the court looks to. New York versus EPA, the court said the Congresses, when Congress doesn't expressly cross-reference an existing regulation that cuts sharply against the inference of ratification. That read back to a case called Continental Airlines, where Congress had used commuter airlines, same phrase that the agency had used the Civilian Aeronautics Board. And this court said the mere overlap isn't enough. So this court's always looked to more when an agency says there's ratification. And then to come back to the deepened history, Judge Jackson called out this issue. She said that the logic of the statute is that the grant of the seven-year period precludes subsequent approvals for what she called new and better drugs. So that's right there. And then she calls out as well the serial exclusivity limitation and says FDA didn't have authority to do that. The way I read the 2017 statute is Congress only addressed the third of those points. It didn't provide any rule-writing authority for subsections A and B, which were what Judge Jackson had in front of her. It didn't address whether FDA could rely on clinical superiority to make a breakthrough determination. It's nowhere in subsection A. It didn't add subsections. And then it turned to subsection D, and it said, we're going to put some limits on how FDA uses its old regulations. Right? So there, there's a permanent grant of authority, right regulations for the implementation of subsection C, serial exclusivity, not our breakthrough unexpired approval context. It says, then you can use those, the old, the definitions and the old- When we look at the context, though, I guess this comes back to Judge Wilkins' first question. Congress specifically put the word same drug. Right, right. And so we're like, well, what did they mean to do by that? And it just seems, it seems that the most likely answer is that they were using the definition of same drug that's in the regulation and intended to make it clear that such drug means same drug. That just seems like you can't, it would be very confusing for them to use the word same drug and not mean what everybody has understood same drug to mean in this context. And the proof that they didn't mean to use the same drug in the way the FDA had is in subsection C1. So at the end of subsection C1, Congress talks about the very relationship between clinical superiority and the same drug. And it says that if to get the serial exclusivity, you have to show that the follow-on drug is clinically superior to any approved or licensed drug that is the same drug. As Congress is thinking about those two drugs as being the same, and nonetheless, one is entitled to a period of serial exclusivity. That's how they were contemplating the same drug. And I think that's because they're contemplating it in the same textual terms that you see in subsection A. It can't possibly mean the same drug unless the second one is superior to the first at the end of subsection C. And so Judge Maida's answer to that was, you're right. The same drug definition can't possibly plug in there. But that just means that the same drug means something different there than it means elsewhere. And that should really set your alarm bells off. Because in the ordinary course, in two closely related provisions of a statute, Congress is going to use a term in the same way. And if it's ratifying, what we have is the similarity between how FDA, the words, those three words, the same drug, in the regulation in the statute. Let me ask you this. So in the exclusive approval statute, 360 CC, subsection A. Yes. If the drug has been previously designated under 360 BB. Yes. And then it is subsequently approved under section 355. Yes. Is there authority for the FDA to approve it, but to not grant it exclusive approval if it has been designated under 360 BB? The limit comes from subsection C. So if under subsection C, the sponsor is seeking an exclusive approval for a drug that is the same and for the same rare disease conditioning of the already approved drug, then the secretary may not grant the exclusive approval under A unless the clinical superiority requirement is met. So prior to 2017, the 2017 amendment, did the FDA have the authority to grant non-exclusive approval when it approved a drug under section 355 that had been designated previously under 360 BB? No. So DPAMED and EGLE said, this is simple. If designated and approved, then exclusivity follows. And it rejected FDA's understanding, interpretation that there was a clinical superiority limitation. And then, of course, Congress, between DPAMED and EGLE, steps in and says, subsection C, here's the limit. You can, in fact, do what FDA had in mind before. But I think the important point is that, for our purposes, when they grabbed onto this issue, they said, let's talk about it. Here's subsection C. Here's D. Here's E. Let's talk about it in our terms. And they used the same drug. Again, this is one of our most powerful tactical points. They used the same drug in a way that can't possibly have the meaning that FDA had ascribed to it in regulation. The other key here, in terms of context, is- But the definition of clinical superiority that this is- Yes. Is maybe not be completely verbatim, but it's pretty much taken from the FDA's regulation. Yes. Yes, absolutely. Actually, I think that cuts our way. Because if they were using the same drug in the way that FDA had used it, clinical superiority in this definition would just flow right with it. Instead, they're using the same drug in a way that requires a separate definition of what clinical superiority is, because they don't think it comes from the same drug. They think they have to say it. It sounds like your argument is that subsection C is confusing. That doesn't mean subsection A is confusing. I don't think subsection C is confusing. I think subsection C makes no sense if you read it the way that they want to read it. You can't plug the same drug in to subsection C. But if you read subsection C just as it is with an ordinary language frame, and you say, oh, subsection C is where Congress did the thing that Judge Jackson said in DEPAMED they couldn't do, it can limit the grant of serial exclusivity. Subsection C1 says what that limit is. C2 provides an operational definition. D tells you how the regulations can be used. E tells you when to publish. It just seems like because subsection C wasn't drafted very clearly, you're trying to say subsection A must mean a particular meaning. Not at all. But I don't know that that's necessarily true. Not at all, Your Honor. We don't have a regulatory definition. So in your framework, what do we do with this regulatory definition of what same drug? I don't think there's a role for the regulatory definition of same drug. Oh, really? We're going to write that out of the statutory structure. In subsection A, because subsection A tells you what the same— Well, anywhere. I think you're saying subsection C and subsection A have to be read a certain way. I'm asking you, what is the role for the definition under 316.314? There's a definition of what same drug means. What's the role for that in your interpretation? Correct. So I don't think it has a role in 360— Does it have a role anywhere? CC. I think it may well have a role elsewhere in the statute. My argument is focused on what— I understand that. But for your argument to make sense, it has to make sense in the entire statute. I don't think so. Here's what subsection D, which I alluded to, is Congress saying, you can't—to the extent the definitions that FDA used to use are inconsistent with the terms of this section as amended by this act, you can't use— FDA says you may apply definitions set forth by the state. To the extent such definitions are not inconsistent. If they're inconsistent, subsection D says they fall away. I think my bottom line, the question I'm trying to ask you is, your interpretation is less likely to be correct if you're trying to tell us that Congress sub salientio decided to excise the definition of same drug from the statutory scheme. I'm trying to understand what is the role for this definition under your interpretation? The regulatory definition didn't define same drug in the statute. The statute didn't say same drug when FDA wrote the regulations. The same drug comes into— Which is why it seems like a logical interpretation of what Congress did was they understood that the FDA has been using such drug to mean the regulatory definition of same drug. So we're going to put that in and make it clear that same drug is what they've been doing all along. And you're trying to say, no, they've decided to require a completely different approach, but using the same words that the FDA has been using all along. I grant there is that overlap of language. It gives rise to, well, why aren't they borrowing it? But then the analysis, Yellen tells us, Johnson tells us, Genis tells us, does it fit? I understand that you can construct an argument for this. But why is that the best reading of this, given the statutory context? And Congress being aware, we have to assume that Congress was aware of the statutory context, and they chose to put in the words that everybody understands what the meaning of the word same drug means. And that's the meaning that the agency has been applying for all this time. It just seems like the more logical interpretation is they were trying to make it official. What the agency's been doing all along, as opposed to upend what the agency's been doing all along, while using the same words and definition that the agency's been using all along. I understand that, Joyceanne. If you plug the same drug into a- I understand the analysis, but why is that a better way of reading it than what I just said? There's no case that I've ever seen, none of my friends' sites, in which a ratification definition flips the valence of a statute. So subsection A is all about a prohibition. Thou shalt not. In their terms, the same drug creates a giant grant of discretion to the agency to decide to approve drugs notwithstanding may not approve. I've never seen a statute. I've never seen a case describe a statute as doing that. It would fundamentally flip around the policy of the act. And the one thing we have from the legislative- I can't think of a statute off the top of my head, but there are often terms that have meanings that are beyond the plain meaning on the page. There are lots of statutory contexts and structures where a meaning is taken on from other parts or the context, and here, that's what we have. But I don't think that's the context. I mean, the context is Congress saying we're going to- with a business investment goal in mind, we want to induce people to invest. We're going to tie the agency's hands for a seven-year period so that it can't approve. And they balance that with if there's a drug that's better for consumers and patients and people, if it's clinically superior, we're going to allow that because it's good in the grand scheme. They're trying to balance encouraging the drug to be developed while also not making sure that better drugs are going to be kept out of the market because that's not good for patients. But remember, there really is a balance here. My friends are focused only on the sort of follow-on drug portion of the balance. They're not focused where I started on there are thousands of drugs or thousands of diseases affecting millions of Americans that have no drug treatment. The goal is to induce investment for those diseases. And a business person is going to say, well, okay, great. What do I get? The drug's designated and it's approved. What do I get? And there's a chance that nobody's going to come up with a clinically superior drug. And then you've got the whole seven years. But if somebody does, you're taking that risk. They're already taking an enormous risk. And what Congress was trying to create was a sense of certainty. But really all the drug makers know about the definition of same drug and the way such drug has been interpreted all these years. And all through all these years, Judge Pan, up to 2017. And here, I keep trying to talk about the context around DPIMED. And DPIMED, of course, is all about serial exclusivity. FDA had barely done these kind of breakthrough applications of the statute. They claimed the authority to do it. We found in the administrative record reveals four instances, the last in 2002. That's why I don't think Congress was thinking about this application. It was thinking about what was in litigation. What FDA said in a post-DPIMED statement that's published in the Federal Register. Let me grab that for your honors. I'll find it when I stand back up. What they said was, we have a huge problem here. We need the ability to limit serial grants of exclusivity. They went to Congress. We don't know exactly what FDA said to Congress. But what the legislative history reflects is a member of Congress saying, here's what we understand this change to do. It's to address the serial exclusivity problem while maintaining incentives to innovate. I don't think Congress thought they were touching. But you still have an incentive to innovate because you don't know that somebody's going to come up with a clinically superior drug. You know, you don't know. But you clearly inserted more risk into what's already a risk endeavor. And that's what they've barely done. I'm sorry. Are you telling me, my understanding is that before this amendment, it said such drugs. But the agency interpreted that to mean same drug as it's defined, which includes that clinically superior aspect of it. Didn't all the drug companies know that? They knew that FDA had claimed that authority. In 2017, they would have known that. That's something you have to take into account before you start investing in developing. And in 2017, they would have known that had it been 15 years, FDA hadn't done it. And now if someone goes. I'm sorry, 15 years, FDA has not applied this definition? From 2002 to 2017, so far as the administrative record reveals, FDA did not use the such drug, same drug move to break through an unexpired period of exclusivity. So Judge Jackson. Let me ask you, so you're saying that from 2002 to when? So up to 2017 when Congress revises the statute, right? So you're saying that in 2017, you believe that the statute, that change does not allow you to break the exclusivity period? Absolutely. Let me just make sure I understand the record in what the district court said in its opinion. In going through the history of these drugs, it said that your client received approval for a drug called Xyrem initially in 2002. And then in 2005, it got approved Xyrem for a new indication and then in 2018, the FDA approved Xyrem for the treatment of EDS or cataplexy in narcolepsy patients seven years or older. That's at page 15 of the district court's opinion, JA 548. Is that all correct? To my understanding, yes. And so then Xyrem develops a low sodium alternative to Xyrem and that's the drug that's at issue here, this Xywave, right? That's right. And it gets approval in 2020 and it gets exclusivity based on a finding that it's superior because it's low sodium, right? Yes. So doesn't Xywave essentially break the exclusivity period that had been established in 2018 of Xyrem? No. So subsection A is clear that it limits only approvals for a person who is not the holder of such approved application or such license. So Congress is not tying the hands of FDA as to the same sponsor. You get one exclusive approval. It doesn't bar that same company from getting another approval. It operates as to other companies. But I do want to touch on the approval for different indications. And I think this is another indication that Congress was not using the same drug as FDA had. FDA's action words were same drug for the same use or indication. Back to what Judge Wilkins just said. I want to make sure you understand this. It seemed like what he described was an application of the same drug definition from the regulation to this context. You said that had it been done between 2002 and 2017. And it seems like they said they gave a new period of exclusivity because it was clinically superior. So that's a new drug. So if somebody else other than your client had done it, would they be entitled to the same thing that your client got? So two distinctions, maybe three. One is, Judge Wilkins was asking about a 2020 approval, not 2017. Two, it's not an application of the same drug definition. The regulations is an application of subsection C, which Biovan was on the book. So that's exactly what subsection C. One says, is there any already approved licensed drug that's the same? Yes, because Zywave, the new drug, and Zyrem, the prior approved drug, both used Proxibate. That's otherwise the same. That's otherwise the same. It's otherwise the same at the designation level. And so in order to gain an exclusive approval, so a marketing exclusivity, the Zywave, Jazz had to demonstrate that Zywave was clinically superior to Zyrem under the definition of C2. That's why, Judge Pan, I don't think there's anything confusing about C1 if you just read the words for the words. The confusion comes in when you try to do what they're doing and say, oh, well, the same drug has the old regulatory meaning. Well, actually, it doesn't have the old regulatory meaning. Actually, it creates surplusage. All of those problems come in when you depart from the plain text and go down the ratification form, right on its face. This is a very simple statute. So let me make sure I understand you. Are you saying that even though it has been presented to us that the longstanding understanding of such drug was that it equals same drug, are you saying that that actually isn't the long-running understanding because it never came up and was not applied between 2002 and 2017? I'm not saying that. FDA understood the words the same drug. Just as you said, it's in its regulations. What I'm saying is I don't see evidence on the text of the statute that Congress applied the same- Would you dispute that, though, that it was sort of common industry knowledge that such drug equals same drug under the regulatory definition? I think people know what's in the regulations. I think that people understood that FDA- You would have to understand. I mean, such drug, the wording that was used in subsection A, it was being interpreted to mean same drug as defined in the regulation. And the arguments we're getting is that everybody understood this. Congress understood it. Are you telling me that that wasn't the understanding? I'm not saying that wasn't the understanding. I'm saying that people took FDA to court over this. Then the question is, what did Congress mean to do when it revisited this subject? What did Congress mean to do when it revisited this subject? You don't dispute that the regulatory backdrop was that the common understanding was that such drug was being interpreted as same drug by the agency. I don't have an empirical view on what people knew. No, I've been saying- When you apply this, I guess the Monsalvo case came out, and they were saying we have to look at the regulatory background and the regulatory backdrop. And I'm just asking, do you contest that the regulatory backdrop and understanding was that such drug equals same drug under the regulatory definition? It was in the regulation. That's how FDA defined it. I'm not disputing that in any way, shape, or form. And everybody understood that to be the- I don't know that everyone understood that. And many people- You don't dispute that. And many people disputed that it was correct, Judge Mann. Some people might dispute that it's correct, but everybody understood that that's the way the agency was doing it. But then the question, the ratification question is, was Congress focused on this application of the same drug to break unexpired periods of exclusivity? Yeah, Monsalvo could assume that it was. Monsalvo says one, if they start with a textually plausible competition. Does days mean how many days does the earth go around the sun? Or for filing, is the government office open? And then they- The understanding was, you get the extra day after the weekend. And the parallel argument here, that the understanding was such drug equals same drug, meaning clinically- And then Monsalvo goes on. And it says, does it fit with the text? Does it fit with the text? And what our point is, there they said, we looked at the text. We looked at the rest. We found no indication that doesn't fit. What? There's a regulatory definition. Does same drug fit with it? No, it doesn't. And the- Same drug fits with the text in the context of the regulatory scheme, because there's actually a definition of same drug that is consistent with- But I don't think that- But it's not consistent. That's my C1 point. You're looking only at the statutory language. I'm saying, what do we do with the regulation? Right. The question, the ratification question is, does the regulation plug into the statute in a way that makes sense in terms of text and context? I'm saying no as the context, because it revolutionizes the statute. It gives the FDA discretion, broad discretion. They say there's no one general standard for a major contribution to patient care or superiority. No one applicable standard. So that's an enormous amount of discretion that they give themselves in a statute that says FDA may not. And it doesn't fit with the text. It's the FDA's language wasn't just same drug. Their action language was same use, same drug for the same use or indication. Congress used the language, same drug for the same disease or condition. So they're not actually using the same action phrase that Congress- So what's your definition of same drug? It is the drug designated under Section 360 BB of this title. It's not a defined- So why isn't the follow-on drug a different drug that's clinically superior? That's different. It's that they both of them. So the question is, what does XyWave exclusivity block? So I'm asking, what's your definition of same drug? It's the drug designated. Then in here- And it's not the same drug designated. It's a different formula, and it's clinically superior, which makes a difference. The FDA is absolutely clear about this in the advanced shared record. The drug designated is OxyB. That's where they designate. And this new drug- Is also an OxyB drug. And the scope of the blocking effect is determined by XyWave's exclusivity. And that's crystal clear on the face of the statute. Well, the statutory language doesn't necessarily support that. If you're going to your statutory language, you just want to go to the meaning of same drug. It seems to me that the second drug is not the same because it's clinically superior. It's the point. I think everyone agrees that sameness is what's the same in what respect? The statute tells you. And now everyone agrees. Everyone agrees that before this amendment, such drug meant same drug. And everyone agrees that that's how FDA thought of it. The question is how Congress thought of it. It has to be how Congress thought of it. We're reading a statute, and we have to understand what the words mean in the statute. Can I come at this from a different direction? Certainly. I want you to look at 360 CCE. Sure. The demonstration of clinical superiority standards. Yes. And then there, it says that the FDA, in order to assist a sponsor, shall notify that sponsor of any plausible hypothesis offered by the sponsor and relied upon the secretary that the drug is clinically superior to a previously approved drug. This is as a basis for designation, right? Yes. And this gets me back to kind of like where I started. Congress did not amend the designation section in 2017. It only, which is 360 BB, it only amended 360 CC, which is this approval. That's right. Okay. So Congress here in this subsection E is seemingly ratifying a restriction on designation, right? It says, you know, under some circumstances, we are, the secretary is only going to designate a drug on a plausible hypothesis that the drug is clinically superior, even though the designation section doesn't say anything about a requirement of clinical superiority, right? Yeah, that's right. That only comes from regulation. That's right. And so when we start you, Judge Wilkins, with the beginning of subsection E, to assist sponsors in demonstrating clinical superiority as described in subsection C. So this is all about the serial exclusivity application, not the breakthrough application under A. Congress is laser focused on serial exclusivity all the way through this section, the legislative history. Well, just because it refers to subsection E, that doesn't tell me that it's referring to serial exclusivity. I mean, we're just, that just begs the question. I mean, the whole case is about the subsection E on only the serial exclusivity or can it break, so to speak, an existing exclusivity period. But I guess my point is this, I'm not trying to be obtuse here, is that even though Congress only amended 360 CC, what they did impacted this other section, 360 BB, and seemed to have ratified FDA's practice of saying that we're only going to designate a drug where there is an existing exclusivity period because another drug has been added. Approved for that rare disease condition. We're only going to designate it. I'm not talking about approval. We're only going to designate it if there's at least a plausible hypothesis that this drug is clinically superior. That wasn't in the statute anywhere, but the FDA was doing that in Congress in 2017, seemed to have kind of like blessed that regulatory structure.  I think I understand, but I don't think that sheds any light on what subsection A means, because you can have a follow-on drug that may be entitled to its own period of exclusivity after a period of exclusivity is expired. There are previously approved drugs that count under subsection C, but none of them have an existing period of exclusivity. Nonetheless, whether or not the period of exclusivity is ongoing, or rather, even once it's expired, the question of whether there's serial exclusivity still turns on clinical superiority under C. So it's sort of once for all time. Can I ask you a question to follow up on Judge Wilkins' question? Under subsection E2, he was pointing to E1. I don't understand why subsection E2 is not inconsistent with your position, because it says, upon granting exclusive approval or licensure under subsection A on the basis of a demonstration of clinical superiority, as described in subsection C, shall publish a summary of the clinical superiority findings. Doesn't that contemplate that under A, there's an exception for clinical superiority drugs? Not at all. What you get under C1 is exclusive approval or licensure described in subsection A. And so then it's asking whether, if C1 is satisfied, and the agency identifies the reasons why C1 and then the clinical superiority requirement C2 is satisfied, it shall publish a summary of the clinical superiority findings. It's in no way inconsistent with our reading of subsection A, which, again, is just a straight reading of the text and one that aligns with how the 11th Circuit understood the neighboring words in the statute for the same disease or condition and catalyst. It said, oh, well, that's obvious. It just reads back to for a rare disease or condition. And so the alignment of what the district court here, how it read the same drug as ratification right next to what it then subsequently concluded in a different case called Neuralis is a refer back is really jarring. Let me just say this to kind of maybe bring this to a close, at least for my purpose. My colleagues may want to continue. The FDA, prior to 2017, was doing a couple of different things with exclusivity that seemed to be beyond explicit words of the statute. One was saying we're only going to grant serial exclusivity if your drug is clinically superior. And to get there, though, they restricted not at the designate this drug unless it's clinically superior, because if it's designated and then you get approval, you automatically get exclusivity. So the way that they were going to kind of try to stop that from happening, additional exclusivity for everybody is to say, we're only going to designate you in the first place if there's at least a plausible hypothesis that you're clinically superior. So that's nowhere in the statute, but that's what the FDA appeared to have been doing. And then the other thing it was doing that wasn't in the statute was saying, yeah, the statute says you get seven years of exclusivity, but if somebody does come along, with a drug, where they prove their plausible hypothesis that the drug is clinically superior, we're going to give them exclusivity and break the seven-year exclusivity of the previously approved drug. Doing both of those things, even though neither one of those is really in the blessed and ratified the first, but not the second. And my question to you is, is that these things kind of go hand in glove. So why should I find that Congress was only blessing one and not the other? A couple of points, and we try to be very specific. They don't go hand in glove because they're really aiming at two different objects. The subsection C limitation, what your Honor described as the first unblessed application of the statute, limits how many sponsors can get exclusivity without demonstrating that they've really made an innovative step. So it's a limitation on the subsection A grant of marketing exclusivity. Grant of marketing exclusivity is the inducement to come into the area in the first place. So I think it's perfectly conceivable that Congress said we want to limit subsequent grants of exclusivity for the same drug to treat the same disease or condition because in many circumstances, there's nothing innovative going on, just blocking new entrants for no reason. But also that they would have said this seven-year period, this is the key inducement. This is how we're bringing drugs to market. And if we don't have this, we know that many of these rare diseases will never get treatments. They're complex. The market's small. But I also want to close with other questions. Judge Wilkins, you said something about the pre-2017 framework that's not quite right. So what FDA did was at both the designation and approval stages, use the clinical superiority idea. They used the clinical superiority idea at the designation stage to say, you need to have a plausible hypothesis of why this will be clinically superior. That raised to my understanding, no particular statutory concern because FDA had expressed rule writing authority under subsection B. And EGLE, this court, said, well, you've got a lot of discretion here under subsection B. So they were using that. Then they turned around the approval stage and said, you got to prove up clinical superiority. And that's what was nowhere on the statute. And my submission here, quite simply, is it's still nowhere on the statute under subsection B. Thank you. Thank you, your honors. And may it please the court, Brian Springer, on behalf of the federal government. I'd just like to pick up on the regulatory history that has been the topic of conversation this morning. For decades, FDA has recognized that determining whether two drugs are the same drug requires looking not just at the core molecule, but the other ingredients and the formulation that can make a drug clinically superior. That's always been the correct way to understand the terms used in the Orphan Drug Act. And Congress's statutory amendments in 2017 made clear what was already plain from the language. I think in this case, Jazz seeks to equate its drug to Avidel's drug by focusing on one chemical similarity and ignoring the many consequential physical differences. Although both drugs use Oxybate, Jazz's drug is a liquid that's available for absorption immediately, while Avidel's drug uses a proprietary blend of coated and uncoated granules to facilitate a release over an extended period. And the real world effects for narcolepsy patients are profound. While narcolepsy patients have to wake up in the middle of the night to take a second dose of Jazz's drug, they can take Avidel's drug once before they go to bed. And so both in common parlance and under the statute, these drugs are not the same drug and the differences matter for patient care. I'm happy to start wherever the court thinks would be the most helpful. Well, how is it when the statute at 360 CCA says that except as provided in subsection B, there's going to be this exclusivity period. And then subsection B has two exceptions that don't apply here. And instead, instead, we have this condition of clinical superiority in... It doesn't refer back to... It doesn't refer back specifically to subsection A with respect to knowing whether we're talking about a serial application as opposed to kind of breaking an exclusivity period. It would have been so much easier for Congress to have just called this an exception or made clear that notwithstanding subsection A or some sort of language like that and make clear that we're breaking an exclusivity period, but it didn't do any of that. So why should we essentially read subsection C as another exception and Congress didn't call it that? So your honor, I don't think it's right to call it another exception to exclusivity. This is a determination of what the scope of exclusivity is in the first instance. So subsection B is about when someone comes in with the same drug for the same disease or condition. In certain circumstances, they can break the exclusivity. They can still come onto the market even though there's an exclusivity that's blocking them. What we're talking about is an understanding of what is actually blocked and that goes to the question of what is the same drug. I would just point the court to subsection A's language. Again, this is the language that Congress adopted directly from the term that Congress took from FDA's regulations that had a definition and have had a definition for over 30 years. But if you look at subsection A, it talks about approving an application filed pursuant to section 355 of a drug designated and then says that to the extent that that happens, FDA is prohibited from approving another application under that same section for the same drug. I mean, if you look to section 355, the analysis that FDA is doing in determining whether to approve an application is approving the whole drug. It's not focusing on just the core molecule. You say that this is really about the scope of the exclusivity, right? Well, there had been previously, prior to 2017, a regulation on the scope of exclusivity and I'm talking about 21 CFR 316.31. Are you familiar with that in general? Yeah, I am, your honor. So it points out that FDA may approve a marketing application for a designated orphan drug for use in a rare disease or condition. And then it says that FDA will not approve another sponsor's marketing application for the same drug for the same use or indication before the expiration of seven years, except, and then it's got these exceptions, withdrawal, consent, failure to be able to essentially meet market demand, et cetera. So it's written in the same way as the statute in that sense, in that it lists those as exceptions and clinically superior isn't like an exception, right? That's in this regulation. But it's a regulation about the scope of exclusive approval. So if you're saying that this 2017 amendment was also about the scope of exclusive approval, then how doesn't this regulation kind of undermine, I guess, your position in the sense that the regulation that set forth the scope of orphan drugs with exclusive approval doesn't, doesn't, I guess it has to rely on the otherwise the same drug definition to get you there from the regulation? Your honor, the reason that it leads to the same place is that the regulation that you read that says FDA is prohibited from, among other things, approving an application for the same drug, that phrase, the same drug is the one that is defined in FDA's regulations to mean the same active moiety and not clinically superior. So the phrase, the same drug that appears in that regulation, and then that Congress added directly into the statute is defined exactly in that way to bring in the idea of clinical superiority, which is the way sort of in ordinary parlance, we think about drugs that one that has different ingredients in a different formulation and works in a different way can be a different drug. Your friends on the other side say, though, that if you use the definition of same drug from the regulation and you just tried to plug it into the statute, it wouldn't make sense because the verbiage is a little different. Talking about, I think, use or indication instead of disease or condition, et cetera. What's your response to that? Your honor, I mean, a couple of responses to that. I mean, I think kind of the overarching response is I don't think they actually really point to anything in A that creates a problem. They do talk about C, but the district court explained how, you know, you can understand what FDA was defining here to talk about a drug that sort of looks the same at first blush, but then you determine it's clinically superior, and therefore, you know, it might be otherwise the same, but it's not the same drug once you determine the clinical superiority. And I, you know, I understand my friends to also be talking to this separate portion of the regulation that I think your honor also read about same use or indication, but that sort of pertains to a different phrase, the phrase same disease or condition, which is an issue in this case. It is presented in a different case that's pending before this court. And I would encourage the court to just look at, you know, the phrase, the same drug, which again comes directly from FDA's regulations that has, you know, long had this regulatory definition. Can I ask you just a real world question? We're in year five of Jazz's exclusivity and year two Avidel's exclusivity, right? How does that work? Are they sharing the market? How does that work? Sure. My understanding is that in general, that's right, that they're sharing the market and that, you know, I think that I believe that Jazz's exclusivity expires in 2027 and Avidel's goes until 2030. So they're both allowed to be on the market now because there was nothing that was blocking Avidel's drug from being approved, but they each have exclusivity that, you know, goes for whatever time they have. I think Judge Henderson's question raises a real question. So how is it exclusivity if you're not really exclusive? Again, the question is the scope of exclusivity and everyone, you know, in particular, because FDA's regulations, everyone has known since, you know, at least 1992, that the right way to understand the scope of your exclusivity is that if someone comes along and develops a clinically superior drug, they can get approval and come on the market. And that's the whole point of what Congress was trying to encourage here was to have drug sponsors, create drugs, you know, create better treatments for rare diseases or conditions. And that's exactly the way that this plays out under FDA's regulatory definition. And again, the term that has now been put directly into the statute. So if there isn't exclusivity, anybody can come on the market and market the exact same not clinically superior formulation that you're marketing? Your Honor, my understanding, right, is that the exclusivity is what's doing the blocking of, you know, an approval of a drug that looks the same. So it's not an orphan drug. It's just any old drug and you get approved. People can start making generic versions of your drug immediately? I'm not sure I'm understanding. I mean, I think the answer is yes, in terms of, so this all arises just in the context of orphan drugs. And if your orphan drug is designated to treat a rare disease or condition, when you get approval, then for seven years after that, FDA can't approve a follow-on. I don't understand how this works. Maybe I'm misunderstanding. Some other way of protecting it. Other people can come in and start making the same thing. That's correct, Your Honor, if this protection were not there. But because the scope of it includes the idea, you know, from the phrase same drug, that someone who develops something that's clinically superior can come onto the market. And so for the same drug, nobody else can come in using Oxybate unless it's clinically superior to both of them. That's correct, Your Honor. That's correct. Well, then did Xyrem have to be clinically superior? It didn't, did it, with its serial seven-year exclusivity period? It was either treating a different range of patients or different conditions? That's correct. It was both treating different patient populations and also it was the same sponsor who was coming back. So, the same sponsor can come back. They're not blocked under the text of A. We ask the court to affirm. Thank you. Let's see. Mr. Perry? May it please the court? Bill Perry for Intervenor Avedil. In 2017, Congress did not silently overrule 25 years of regulatory history by choosing to adopt the precise terminology that FDA had been using throughout that term. I'd like to show how extensively Congress borrowed from FDA's regulations in 2017. Of course, we start with the phrase same drug, which appears in the key statutory provision, which is 360 CCA. But only the starting. What Congress did was adopt the subsidiary definitions from the regs. Let me just interrupt you right there. Congress didn't just put in the word same drug, right? It put in the words, I'm not sure if I have it, same drug for the same disease. Right. That was the phrase that it used instead of such drug for such disease. I'm sorry. I don't mean to cut you off. That was the, that was that key amendment, right? It omitted such drug for such disease or condition and substituted the same drug for the same disease. It put same in the place of such with respect to both of those terms. But there's a, there's a phrase there. I guess I just want to get your, your response to the fact that like the scope of exclusivity provision that I was asking your friend about earlier, which was 316.31 uses the phrasing, the same drug for the same use or indication. So it does not use the exact same phrase. Why shouldn't I be concerned about that? Because that poses a completely separate not here before the court. In this case, it was an issue that is use or indication or same disease and condition in the catalyst case. And here's what was at stake in that case. There was no question about it being the same drug. It was the drug had been designated for a disease called lambs. The second drug came along also for lambs, but with a separate indication or FDA wanted to split this notion of same disease or condition into sub parts and give different exclusivities, right? Every drug, when it goes through this orphan drug process, as your honor knows from the designation is identified in connection with a rare disease or condition. That's where this same disease or condition comes from. Completely different for same drug. What happens at the designation stage is that you come forward and you say, I think I have a drug that I want to get approved. Ultimately, I want to take advantage of the various benefits Congress has provided. If you're designated, including tax breaks for the development of the drug, ultimate chance at exclusivity and all those sorts of things. Of course, you don't just identify what your active moiety is. You go through the statute and the regs and identify everything you know at that time about your drug. Then you also have to, if you're the second one along, show a plausible hypothesis of clinical superiority. That is that your drug, which you're intending to make, is going to be different than a drug that's already approved. As your honor noted, that's an E1 of CC, what Congress just did in the 2017 amendments. What's going on here is you have two very separate issues. One is, what does same drug mean? When Congress in 2017 put same drug in the statute, did it mean to embrace the regulatory deficient, which I would like to say it obviously did for all the reasons I'm about to explain. Then a completely separate issue, which was addressed in Catalyst, about whether the FDA can split up orphan drug designations for the same disease and condition among separate uses or indication within that same disease or condition. It can't, but it is appropriate to look at same drug the way that the regulations did. I think your question to my friend earlier was something about the exceptions. In other words, why didn't they make CCC an exception? Here's why. Because the threshold issue to get to an exception is whether two drugs are the same. When they're not the same, there's no point in going to an exception. Now, for 30 something years, FDA has operated with the definition of same drug from its regulations, which as you know, is a combination of active, moiety, and clinically superior. The subsidiary definition of clinically superior includes significant therapeutic advantage, greater efficacy, greater safety, major contribution to patient care. Every one of those terms from the FDA definitions appear in the 2017 amendments. Every one. It's not ambiguous what they were doing here. They were adopting the regulatory structure that FDA had in place. They were preserving that structure. Now, I think it's appropriate, as this court has already done, to focus on E1 and E2 of the statute. They're very important because they show how Congress thought all these pieces would play, how they would work together. Your Honor, first identified E1, which is essentially endorsing the plausible hypothesis regulation about how the designation works. The designation stage, which is often years before the approval stage under 360 CC, you don't necessarily know what the drug is at that stage. But you still, if you're the second sponsor to come along, have to show a plausible hypothesis, importantly, of clinical superiority. Congress was adopting that concept. But E2 is perhaps even more important. It tells you what Congress thought would happen under 360 CC. You're not making some separate judgment under 360 CC that you're making under 360 CCA. They're tied together. Here's what it says. Upon granting exclusive approval under subsection A, that means the decision is being made under subsection A. And that in turn means that it's being made under the definition of same drug. It has to be. And then it goes on here. On the basis of a demonstration of clinical superiority as described in subsection C, what that tells us is that those two sections work together and they have to work together. And it also tells us that Congress thought subsection A and subsection C would both rely on the concept of clinical superiority, which they do. So that's not all Congress did when it adopted the regulatory text. In the statute, it uses the term otherwise the same drug a couple different times. That is a unique term that refers to this two-part definition. It appears five times in the regulation, including in the definition of clinical superiority. And it always means that there's a temporal process. First, you look and see if they have the same active moiety. And then later, after further submissions, after scientific analysis, and the court can see how this all played out in the record, in this case, you decide whether the drug is clinically superior. It might appear that the drug is the same drug as another drug when you're just looking at active moieties, but you have to run out the ground ball and do the rest of that analysis. And that's what subsections A and C do together. The case law that we've cited from the Supreme Court and this court, I think, tell us what we're supposed to do in a circumstance like this, when there's been such a huge reliance by Congress on the regulatory history. Of course, Monsalvo Velasquez, maybe two weeks ago now, says when there's a longstanding administrative construction, you generally presume Congress meant to adopt those regulations. That presumption was all but dispositive in that case. CFTC v. Schor says in this type of circumstance, using that regulatory construction is, quote, virtually conclusive that Congress meant to employ that. These are all canons, rules of interpretation, presumptions. We cite three or four cases from this court over the last few years. Your friend on the other side points out that it might be pretty conclusive that they were dealing with the depo-med issue, serial exclusivity regulation, as far as ratifying that. But it is far less clear that they were going beyond that. And we have precedent that says we need some more explicit clues. Well, let me suggest, Your Honor, that the precedent of this court and the Supreme Court are not that you need more explicit clues. In fact, often cited as Scalia's treatise, Reading Law, on this point, and if I might add that to our record here, if a statute uses words or phrases that have already received authoritative construction by a responsible administrative agency, they are to be understood in accordance with that construction. That is quoted, including in Hickvision, Your Honor, Washington Alliance, and Wang v. Blinken, all recent cases from this court. And let me add, if I might, Your Honor, that my friend on the other side had been communicating with the FDA over multiple years before our approval about this clinical superiority issue and how the statute worked. Here's what my friend said in a letter from December of 2022 to the FDA. It's in the record at JA 382 to 383. That's the middle of the document. The document starts at JA 377. I'm just quoting here. The clear and direct command of the statute is that the only way for Avidel to break the exclusivity-protecting Zywave, it's Jazz's drug, it's for Avidel to demonstrate that its drug is clinically superior. In other words, they were reading the statute two and a half years ago to have the same meeting the district court adopted here, exactly the same meeting. After the 2017 amendments, they understood that's what this statute meant. I'm sorry, where was that? That's in a document beginning at JA 377, and the particular quote is from JA 382 to 383. Now, if I might, Your Honor, I'd like to contest one other thing that my friend on the other side says. It's about the text, the language of 360CCA. Here, I think he believes that we will take as given that the drug designated is the first of the two comparators when you compare two drugs to each other to see if exclusivity prevents FDA from approving a second drug. The language doesn't actually say you compare the designations. Here's what it actually says. It says, if the secretary... What are you reading from now? I'm reading from... I'm sorry, I'm moving around a lot. 360CCA. So, A begins, and I'm paraphrasing here because there's a lot of excess language for this purpose, but if the secretary approves an application, that's the first comparator. And then the description in two prepositional phrases identifies, describes what that application is for a drug designated under Section 360BB. Still, it's the application that's the subject right there. It's not the drug designated. The prepositional phrase is describing application. And then the second comparator in that drug comparison is another application for the same drug. In other words, you compare one application to another. That's what textually this section is telling us. You apply the same drug test, which of course comes from the reg. But let me just say this. Even if you applied the test and you used the designation, the active we're still different. The second comparator is still different no matter how you read the first part of that sentence. And Your Honor, I think correctly noted the plausible hypothesis test, plausible hypothesis of clinical superiority at the designation stage. We're different because we demonstrated at that stage that we met that test. We were going to be clinically superior. And let me say there, the site in the joint appendix for that, for our designation, shows we're different. It is 203 to 204 in the joint appendix. And then the explanation that will shed some light on the pretty significant amount of effort and time that FDA spent on this issue is JA 115 to 125. Here's what they were looking at. They were looking at to see if our drug had a different effect in patients' bodies. That is, it might have had the same chemical, but would it affect the physiology of a patient differently? Absolutely it would. They consulted sleep experts and they looked through it. It was a major contribution to patient care. That's what makes it a different drug. That's important. But here's the third problem with my friend's analysis of the text here. I think you heard him say that if you go to section C, which is the new section called condition of clinical superiority, again, this is described in section E2, he says you can't read that section sensibly. The district court explained why you can't. It's on pages 31 and 32 of the opinion. Also, I would recommend page 30, very important about the meaning of E2. But here's the point. If you just put my friend on the other side's test for what drug means in here, you'd be comparing Oxivate and active moiety to Oxivate and active moiety to determine if Oxivate were clinically superior to Oxivate. That's nonsense. That's not how this works. The way that the same drug test works, this has got two parts. First, you look at active moiety, as I said, then you turn to clinical superiority. And the question ultimately is, is this drug better for patients? Does it have a different impact upon patients in their body or otherwise? There are a lot of examples in the record of drugs that had the same active moiety but were clinically superior. One that comes to mind is a drug called Valtoco, where the treatment for people with epilepsy for cluster seizures where they need immediate relief, same active moiety in the first drug and the second, but the second you could use through a nasal inhaler and the only administered rectally. And the FDA found that was a really significant difference. It made it a different and much better drug. So this is not only the right test because it adopts very clearly, Congress has done very clearly to adopt the regulatory structure that had been preexisting, but it's also the best reading of the statute. You can't just say that because two drugs have same active moiety, I'm going to ignore all the inactive ingredients and how these actually work on the body. They're the same drug. They're not. And you can't just say any slight difference, an immaterial difference between one drug's application, maybe an inactive ingredient, always makes this a different drug because that undermines exclusivity. What FDA did was find the sweet spot where you're talking about the effect on patients. That is the best reading of the statute. And that's what Congress recognized in 2017 when it widely adopted the statutory text, I mean, sorry, the regulatory text into the statute. All right. If there are no questions, then thanks, Doug. Thank you. I'm going to hold you to two minutes on this. That's more than fair. I have a methodological point, a statutory point, and then a same drug comparison point. I'm methodology. I'm going to go with Justice Scalia at the Supreme Court over Justice Scalia in a book. Johnson v. United States says that if you're going to consider ratification, you have to make sure that it fits the context. Yon says exactly the same thing. And that's why this is ultimately a question of how you read the statute that Congress wrote, not the regulation that FDA wrote. Before you can take the step of saying they must have absorbed it into what they were thinking, to ask whether it fits, here it would revolutionize the statute. It would untie the agency's hands with a couple of words. On the couple of words, Judge Wilkins, I think you're exactly right to point to how FDA had defined scope of orphan drug approval. That's the action language I was talking about earlier. FDA used the words the same drug for the same use or indication. The statute doesn't use those words. I understand there's a catalyst versus jazz point. But the point is, for these purposes, they're saying you got to just read it as though Congress absorbed everything that agency had done. But Congress used different words for exactly the same thing, what's the scope of drug approval. Can you address the apparent concession in the record that was pointed to by your friend on the other side at 382 to 383? I guess it's the docket signed by you. It is. And it says the only way for Avidyl to break the ODE protecting thyroid would be for Avidyl to demonstrate that it's clinically superior. It is. That's what we said. And then we took it back. We subsequently argued to the agency, actually, there's no letter and all the way up. On the same drug comparison, Mr. Perry makes a point. He says, well, you know, even if you read same drug as referring back up, the two drugs are different. That's not how FDA designates. Our reply brief at page 15 addresses the way that FDA designates and also FDA's own explanation of why they at one point used sodium oxalate for extended release, oral suspension, the JA203 site to describe the designation. FDA explained that. And so finally, just to come home, if you look at subsection A and you ask yourself, did Congress rewrite this provision of the statute to create a new exception that hadn't been there before? The judge Jackson had told them isn't there. You only see a portion of an overlap between how FDA had described scope of orphan drug approval and how FDA defined the term. That's not enough under any precedent this quarter or this spring. Thank you.
judges: Henderson; Wilkins; Pan